IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>RANDY DIAZ PIZARRO,<br><br>Defendant. | 1:24-cr-10039-WGY |

**DEFENDANT RANDY DIAZ-PIZARRO'S SENTENCING MEMORANDUM**

Now comes the defendant, Randy Diaz-Pizarro, in the above-referenced matter and respectfully offers this Sentencing Memorandum to the Court in anticipation of Defendant's sentencing hearing scheduled for April 2, 2025.

On January 13, 2025, Mr. Diaz-Pizarro pled guilty, pursuant to a plea agreement, to one count of Possession with Intent to Distribute Cocaine, in violation of 21 U.S.C. § 841(a)(1), and one count of Felon in Possession of a Firearm and Ammunition, in violation of U.S.C. § 922(g)(1).  Mr. Diaz-Pizarro does not dispute the calculation of the Guidelines Sentencing Range ("GSR") set forth in the plea agreement and confirmed by the U.S. Probation Office in the Presentence Investigation Report ("PSR").  Mr. Diaz-Pizarro agreed to a voluntary order of detention and will have served 26 months in custody at the time of sentencing.  Mr. Diaz-Pizarro urges the Court to consider numerous mitigating factors, including Mr. Diaz-Pizarro's serious underlying medical condition, in determining a just sentence.  *See* United States Sentencing Guidelines §§ 5H1.4 and 5H1.9; *see also* 18 U.S.C. § 3553(a)(2)(D).

Mr. Diaz-Pizarro asks the Court to impose a sentence of 7-9 years and seeks the Court's recommendation that he serve his custodial sentence in a Federal Medical Facility.

I.        **Calculating a Reasonable Sentence:  A Below-Guidelines Sentence is Consistent with the Goals of § 3553(a)**

Mr. Diaz-Pizarro asks this court to impose a sentence of 7-9 years, which is consistent with the goals of 18 U.S.C. § 3553(a).  This sentence is sufficient, but not greater than necessary, to comply with the purposes of Section 3553(a).

        A.        **The History and Characteristics of Defendant Reveal a Chaotic Childhood Characterized by Neglect**

Mr. Diaz-Pizarro's childhood was rife with abuse and neglect.  He was born in the Dorchester neighborhood of Boston and primarily was raised by his mother until about age 15, when his father and maternal aunt took primary responsibility for his care.  PSR ¶ 61b.  Mr. Diaz-Pizarro's mother, Michelle Diaz, was the single mother for four children and struggled, and continues to struggle, with severe, untreated schizophrenia.  PSR ¶ 60.  Mr. Diaz-Pizarro's mother was officially diagnosed with schizophrenia when he was 18 years old, but he recalls witnessing concerning behavior by his mother for years before that time.  PSR ¶ 60.  As a result of his mother's condition, Mr. Diaz-Pizarro was raised in his father's house after age 15.  PSR ¶ 61b.  Mr. Diaz-Pizarro grew up in a large family of meager means but has maintained, and continues to maintain, a close relationship with his father and has a good relationship with his mother when she is stable. PSR ¶ 59.

Because of his family's residential neighborhood, his unstable family and living situation, the limited means of his family, and the prevalence of severe mental health issues in various family members, Mr. Diaz-Pizarro was raised in a home without food, discipline, or structure.  PSR ¶ 61a.  The defendant had no parental figure in his life and was forced to take care of himself and his younger sisters when desperation set in at an early age.  PSR ¶ 61a.  The defendant recalls that no one ever prepared breakfast, lunch, or dinner for him or his siblings

growing up and that no one supported or prioritized his attendance in school; as a child, he understood that he had to fend for himself. PSR ¶ 61a. Mr. Diaz-Pizarro was shot in the stomach when he was 16 years old. PSR ¶ 70. Fortunately, none of Mr. Diaz-Pizarro's organs were punctured, and the bullet does not remain in his body. PSR ¶ 70. However, during that same year at age 16, Mr. Diaz-Pizarro received the shocking news of being diagnosed with Evans Syndrome, a rare autoimmune disorder that greatly impacts his life. PSR ¶ 71.

Despite Mr. Diaz-Pizarro's troubled childhood, he has significantly more support than most in his situation. He maintains a close relationship with his father as well as his mother when she is stable. PSR ¶ 59. He also receives familial support from his maternal aunt and several of his siblings and half siblings with whom he maintains a close relationship. PSR ¶ 60. Mr. Diaz-Pizarro's father owns a triple-decker house in Rhode Island, has previously provided Randy with his own floor in the house before, and has confirmed that Randy can live with him again in the future. Finally, Mr. Diaz-Pizarro has worked as a personal trainer since 2017 at InnerCity Weightlifting, a Massachusetts nonprofit organization dedicated to helping those most impacted by mass incarceration, and the InnerCity Weightlifting ownership has stated that Mr. Diaz-Pizarro may come back at any time to continue his employment. PSR ¶ 92.

Mr. Diaz-Pizarro submits letters of support from InnerCity Weightlifting, his father Luis Pizarro, and from his friend and mentor Soffiyah Elijah, all of which address his promising future, despite these personal challenges. These letters are attached as Exhibit A.

### B. Mr. Diaz-Pizarro's Sentence Should Reflect His Significant Underlying Health Issues

Mr. Diaz-Pizarro's significant and rare health issues also warrant the incorporation of a downward variance in the sentence imposed. In particular, consistent with 18 U.S.C. § 3553(a)(2)(D), the Court's sentence should "provide the defendant with needed educational or

vocational training, medical care, or other correctional treatment in the most efficient manner." Mr. Diaz-Pizarro was diagnosed with Evans Syndrome in 2008 at age 16. PSR ¶ 71. Evans Syndrome is a rare autoimmune disorder in which the body's immune system mistakenly attacks and destroys its own blood cells. PSR ¶ 71. This leads to low levels of red blood cells (anemia), platelets (thrombocytopenia), and sometimes white blood cells (neutropenia). PSR ¶ 71. Low platelet counts in individuals with Evans Syndrome make it difficult for the body to control bleeding, leading to spontaneous hemorrhages in vital organs, which result in life-threatening complications if not urgently treated. PSR ¶ 74.

Where, as here, a defendant suffers from "an extraordinary physical impairment," such an impairment may support the imposition of a sentence below the applicable guideline range. *United States v. Martin*, 363 F.3d 25, 49 (1st Cir. 2004); *see also United States v. Woodward*, 277 F.3d 87, 92–93 (1st Cir. 2002) (recognizing the district court's authority to depart in the case of an extraordinary physical impairment). A court may find such an extraordinary condition when it determines that imprisonment would shorten a defendant's life or when the Bureau of Prisons is unable to adequately provide for the inmate's medical needs. *Martin*, 363 F.3d at 49.

Mr. Diaz-Pizarro retained hematology expert Dr. Clinton Merrill, Jr., M.D., to review his medical records and provide additional information concerning his Evans Syndrome diagnosis and how it impacts Mr. Diaz-Pizarro. Dr. Merrill's report is attached as <u>Exhibit B</u> (Independent Review of Medical Records, dated Jan. 19, 2025) ("Dr. Merrill's Report"). In his report, Dr. Merrill addresses Defendant's condition and treatment and how prison conditions will impact the management of Mr. Diaz-Pizarro's Evans Syndrome diagnosis.

As noted in Dr. Merrill's report, after experimenting with various combinations of medication to treat his Evans Syndrome diagnosis with varying success, Mr. Diaz-Pizarro

4

ultimately was prescribed Promacta at a dose of 50 mg daily.  *See* Dr. Merrill's Report, Exhibit B, at 2.  Promacta helps maintain Mr. Diaz-Pizarro's platelet count at a normal level, around 100,000, and avoid other medications which either did not work effectively or which Mr. Diaz-Pizarro's body tolerated poorly.  *See* Dr. Merrill's Report, Exhibit B, at 1-2.  However, as shown by Mr. Diaz-Pizarro's bloodwork from his numerous medical incidents since being held on these charges, the Promacta does not always maintain his platelet count at a safe level as the effectiveness of the medication may degrade over time.  PSR ¶ 72.  This situation has resulted in Mr. Diaz-Pizarro's platelet count dropping to as low 10,000 or less several times since being held in custody.  When Mr. Diaz-Pizarro's platelet levels drop, he is in urgent need of treatment to increase his levels as a minor injury that ordinarily wouldn't be serious can become life threatening.  *See* Dr. Merrill's Report, Exhibit B, at 3.  Because of the nature of Evans Syndrome, Mr. Diaz-Pizarro may not have any external symptoms indicating low platelets, but bloodwork would quickly demonstrate the urgency of increasing his platelet levels.

    Mr. Diaz-Pizarro's ongoing medical needs, as shown in Dr. Merrill's Report, cannot be supported in a non-medical facility.  *See* Dr. Merrill's Report, Exhibit B, at 3.  Mr. Diaz-Pizarro requires regular bloodwork to monitor his platelet levels; regular access to a hematologist; and access to a special pharmacy for his Promacta, steroids, and additional/different medications prescribed by his doctors.  *See* Dr. Merrill's Report, Exhibit B, at 2-3.  This care is especially important where Mr. Diaz-Pizarro has been hospitalized several times in the past year because of his low platelet levels.  PSR ¶ 72. Although the Promacta has worked relatively well in the past, recent bloodwork has shown precipitous drops in Mr. Diaz-Pizarro's platelets over short periods of time.  PSR ¶ 72.  This information may suggest that the effectiveness of the Promacta has been waning over time which is a possible result after managing Evans Syndrome for many

years.  PSR ¶ 72.  Mr. Diaz-Pizarro's dropping platelet levels indicate a possible change in medication may soon be necessary.  PSR ¶ 72.

Mr. Diaz-Pizarro's custodial status since January 2023 has impacted his medical condition and will continue to do so in the future unless appropriate, medically necessary precautions are taken.  The sheer number of hospitalizations due to low platelet counts since being arrested is strong evidence to show that the hardship of being sentenced to prison will be harder on Mr. Diaz-Pizarro than the average inmate.  Mr. Diaz-Pizarro's condition makes him significantly more susceptible to serious injury or death resulting from routine prison incidents and forces him to be hyperaware of such incidents.  Mr. Diaz-Pizarro understands that other inmates will not respect his vulnerabilities—and may seek to exploit those vulnerabilities—and he feels he cannot take any chances with other inmates' behavior.  This sensitivity has resulted in incidents in which Mr. Diaz-Pizarro appears to be the aggressor because he took preemptive steps to protect himself.

Dr. Merrill explains that the limitations of a non-medical facility could be catastrophic for Mr. Diaz-Pizarro because his symptoms indicating low platelets are often internal and cannot be identified or properly treated without regular access to bloodwork, a hematologist, and a pharmacy capable of providing rare medications.  *See* Dr. Merrill's Report, Exhibit B, at 2-3.  Furthermore, Dr. Merrill states that while Mr. Diaz-Pizarro has been fortunate that he has not had any significant episodes of bleeding or bruising, "one cannot assume that the relatively benign nature of his disease in the past will not result in future, potentially life-threatening episodes of bleeding." *See* Dr. Merrill Report, Exhibit B, at 2.  This situation is especially true where the effectiveness of the Promacta, which Mr. Diaz-Pizarro has been taking for many years, appears to be waning.  The prevalence of Mr. Diaz-Pizarro's hospitalizations during the 26 months he

has been incarcerated—after being transferred to a facility purportedly able to treat Mr. Diaz-Pizarro's Evans Syndrome—demonstrates the need for a sentence below the applicable guideline range in a medical facility.

Counsel has collected medical records from six facilities totaling 1,362 pages concerning Defendant's medical treatment, primarily concerning Defendant's diagnosis, condition, and treatment for Evans syndrome. Based on Dr. Merrill's Report, together with Defendant's noteworthy medical history, Mr. Diaz-Pizarro will experience a more difficult and challenging day-to-day prison life than inmates of average health. In short, Defendant's medical condition and medical needs support a downward variance.

### C. Mr. Diaz-Pizarro's Career Offender Status Should Be Considered in Context

Although Mr. Diaz-Pizarro's criminal history qualifies him as a Career Offender, the Court should consider the age and nature of his qualifying convictions, which support a downward variance.

The convictions that form the basis for Defendant's Career Offender status include two state convictions from 2011 (ADW) and 2019 (PWID Class A), when Defendant was 19 and 27 years old, respectively. PSR ¶¶ 33 & 36. Mr. Diaz-Pizarro asks that the Court consider recent Proposed Amendments to §4B1.1 (Career Offender). *See United States v. Ahrendt*, 560 F.3d 69, 80 (1st Cir. 2009) (remanding case for re-sentencing "to allow the court the opportunity to consider the Sentencing Commission's updated views."); *cf. United States v. Allebach*, 526 F.3d 385, 389 (8th Cir. 2008) (stating "[c]onsideration of the pending amendment is merely permissible, not required.") On December 19, 2024, the United States Sentencing Commission proposed its 2025 Amendments to USSG § 4B1.1, which re-define "controlled substance offense" to include only prior *federal* drug convictions (and not state drug convictions). Should

this proposal be adopted, prior state drug convictions would be excluded, and Defendant would no longer qualify as a Career Offender, because one of his two prior qualifying offenses is a state-level drug offense. The Court is no longer "rigidly controlled by the guideline range" in setting an appropriate sentence and "is free to consider the Commission's current thinking for whatever use it may be in exercising the court's judgment about the proper sentence." *United States v. Godin*, 522 F.3d 133, 136 (1st Cir. 2008). Here, Defendant asks that the Court take into account these proposed Amendments that would be consequential to his GSR.

If the Court does not apply the Career Offender guidelines, Defendant's Total Offense Level would be 25, with a GSR of 110-137 months (rather than 151-188 months).

**D.    A Sentence Below the GSR Will Still Achieve Specific Deterrence**

The longest incarcerative sentence served to date by Mr. Diaz-Pizarro was a four-year state sentence. PSR ¶ 33. Mr. Diaz-Pizarro served this four-year sentence following his conviction for a firearms offense committed when he was 18 years old (15 years ago), and he is now 33 years old. Id. Moreover, Defendant has never previously served a federal sentence; consequently, he has never previously had the benefit of structured and supported supervision following his release from custody. With this background in mind, Mr. Diaz-Pizarro suggests that a sentence of 7-9 years would represent a graduated sanction with a substantial step-up in the imposed period of incarceration that will, among other things, achieve specific deterrence. Upon his release, Mr. Diaz-Pizarro will have the opportunity for the U.S. Probation Office to supervise and support his future educational and employments pursuits. Among other things, Defendant is passionate about personal training and plans to pursue post-incarceration employment as a personal trainer.

## II. Conclusion

Mr. Diaz-Pizarro has accepted responsibility for his criminal conduct[1] and suggests that, in fashioning a sentencing that will afford adequate deterrence to future criminal conduct, the Court can and should consider his unusual background and personal history and his serious medical condition, among other factors. Mr. Diaz-Pizarro asks this Court (i) to impose a sentence of 7-9 years as being a sentence that is sufficient, but not greater than necessary, to achieve the purposes of sentencing,[2] (ii) to order mental health evaluation and treatment, as appropriate, and (iii) to recommend that the U.S. Bureau of Prisons designate Defendant to a Federal Medical Center to ensure that Defendant receives proper monitoring and treatment for his Evans Syndrome.

Respectfully submitted,

*/s/ Linda M. Ricci*
Linda M. Ricci (BBO# 600284)
Colin W. B. Kennedy (BBO# 711290)
Greenberg Traurig, LLP
One International Place
Boston, MA 02110
Tel: (617) 310 – 5278
Tel: (617) 310 – 5237
Email: linda.ricci@gtlaw.com
Email: colin.kennedy@gtlaw.com

Dated: March 28, 2025

---

[1] It is noteworthy that, in connection with the drug charge to which he has pled guilty, Mr. Diaz-Pizarro was in possession of a very small drug quantity. In particular, he possessed 25 small bags totaling 5.02 grams of a substance that tested positive for cocaine.

[2] The United States Sentencing Commission's ("USSC") Judiciary Sentencing Information ("JSIN") also provides support for the imposition of a sentence below the GSR. In particular, the average and median sentences for Defendant's crimes of conviction are as follows: (1) Count 1 – Possession with intent to distribute, average sentence: 104 months; median sentence: 120 months; (2) Count 2 – Felon in possession of a firearm and ammunition, average sentence: 118 months; median sentence: 120 months.

## CERTIFICATE OF SERVICE

     I, Colin W. B. Kennedy, hereby certify that this document has been filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on March 28, 2025.

                                              */s/ Colin W. B. Kennedy*
                                              Colin W. B. Kennedy